## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **RENE CHALCO,** | : | |
| | : | |
| **Plaintiff,** | : | **No. 3:15-CV-340 (VLB)** |
| | : | |
| **v.** | : | |
| | : | **November 9, 2018** |
| **CHRISTOPHER BELAIR, ROBERT** | : | |
| **MADORE, RYAN HOWLEY, and** | : | |
| **ANDREW KATKOCIN,** | : | |
| | : | |
| **Defendants.** | : | |

## MEMORANDUM OF DECISION GRANTING DEFENDANTS'
## MOTIONS FOR SUMMARY JUDGMENT [DKTS. 112, 127]

Plaintiff Rene Chalco ("Plaintiff") brought this action against City of Danbury police officers Christopher Belair, Robert Madore, Ryan Howley, and Andrew Katkocin (collectively, "Defendants"). Before the Court are Defendants' renewed Motions for Summary Judgment as to Plaintiff's claims that Defendants deprived him of his rights under the Fourteenth Amendment to the United States Constitution in violation of Section 1983 by (1) creating a risk of harm to him under a state-created danger theory and (2) acting with deliberate indifference to his medical needs. For the following reasons, the Court GRANTS Defendants' Motions for Summary Judgment. [Dkts. 112, 127].

### I.      Procedural History

Plaintiff brought this action on March 6, 2015. [Dkt. 1 (Compl.)]. Defendants moved for summary judgment in November 2016. [Dkt. 63 (Defs. Madore, Howley and Katkocin's Mot. for Summ. J.); Dkt. 65 (Def. Christopher Belair's Mot. for Summ.

J.)]. On June 1, 2017, the Court denied Defendants' Motions for Summary Judgment. [Dkt. 94 (Mem. of Decision Den. Defs.'s Mots. for Summ. J.)]. Defendants appealed on June 12, 2017 claiming that the Court should have concluded that they were entitled to qualified immunity. [Dkt. Nos. 100-101 (Notices of Appeal)].

The Second Circuit dismissed Defendants Madore, Howley, and Katkocin's appeal because they failed to plead qualified immunity as an affirmative defense or move for summary judgment on qualified immunity grounds. [Dkt. 125 (Summ. Order) at 4]. The Second Circuit affirmed in part the Court's decision as to Defendant Belair. *Id*. at 5-6. It found that Defendant Belair failed to show entitlement to qualified immunity as to Plaintiff's excessive force claim. *Id*. at 5. The Second Circuit remanded for further proceedings and instructed the Court to rule on qualified immunity as it relates to Plaintiff's claims for deliberate indifference and state-created danger, if properly raised before the Court. *Id*. at 6.

On July 16, 2018, Defendant Belair filed his renewed Motion for Summary Judgment. [Dkt. 112 (Def. Christopher Belair's Renewed Mot. for Summ. J.)]. On July 17, 2018, Defendants Madore, Howley, and Katkocin filed their answer to the amended complaint in which they asserted the special defense of qualified immunity. [Dkt. 113 (Answer to First Am. Compl. and Special Defenses)]. On August 8, 2018, Defendants Madore, Howley, and Katkocin filed their renewed Motion for Summary Judgment. [Dkt. 127 (Defs. Madore, Howley and Katkocin's Renewed Mot. for Summ. J.)].

## II. Factual Background

On March 7, 2013, at approximately 11:00 p.m., Plaintiff went to a bar in Danbury and stayed until it closed at 1:00 a.m. [Dkt. 112-3 (Pl.'s Dep.) at 22:8-22]. Plaintiff proceeded to drive home although he did not have a license and had never been licensed to drive. *Id.* at 23:17-23. There was a snowstorm that evening and snow had accumulated on the ground. [Dkt. 126-3 (Pl.'s Dep.) at 29:20-30:2; Dkt. 137-3 (Pl.'s Dep.) at 29:30-30:2]. The snow made the road slippery. [Dkt. 112-3 at 30:6-24; Dkt. 126-3 at 30:6-24; Dkt. 137-3 at 30:6-24]. On his way home, Plaintiff attempted to stop at a stop sign before White Street, but due to the slippery conditions caused by the snow he skidded through it. *Id.*

While patrolling the area of White Street, Defendant Madore observed Plaintiff's vehicle roll through the stop sign. [Dkt. 127-6 (Madore Aff.) at ¶¶ 4, 6]. Defendants Katkocin and Howley were following behind Defendant Madore in Defendant Katkocin's cruiser. *Id.* at ¶ 5. Defendant Madore stopped Plaintiff and Defendant Katkocin also pulled over. [Dkt. 127-5 (Katkocin Aff.) at ¶ 6]. Defendant Madore conversed briefly with Plaintiff and then returned to his cruiser to write Plaintiff a ticket for failing to obey a stop sign and driving without a license. [Dkt. 127-6 at ¶ 8]. Defendants Howley and Katkocin informed Plaintiff that his car was going to be towed because he did not have a license. [Dkt. 126-14 (Internal Affairs Report) at 4]. By this time, Defendant Belair had also arrived on the scene. [Dkt. 127-6 at ¶ 9]. Defendant Belair exited his cruiser and approached Plaintiff. *Id.* While Defendant Madore was writing Plaintiff's ticket, Defendant Belair stayed with

Plaintiff.  *Id*.  Plaintiff appears to have asked how he would get home and Defendant

Belair responded:

> "You got here somehow. Then walk back home. Take a fucking bus.
> Take that car once you get it out. I don't care. But stop being in this
> country and almost fucking killing people because you're too fucking
> stupid to call a ride. Honestly if there wasn't four other cops here . . .
> if there wasn't four other cops I'd beat the shit out of you right now . .
> . . It's an asshole like you that killed my uncle because he was fucking
> drunk driving, right? Some douchebag like you that decided to drink
> too much and go out in the middle of a fucking snowstorm when you
> shouldn't even have been driving anyway. But that's alright. You don't
> even give a shit about other people's families do you? . . . . You're a
> piece of shit." [Dkt. 72-2 (Audio CD Labeled A-1); Dkt. 126-3 at 49:14-
> 50:10; Dkt. 137-3 at 49:14-50:10].

Defendant Belair then punched Plaintiff in the mouth and nose.  [Dkt. 126-3

at 50:9-14, 52:2-13; Dkt. 126-14 at 14; Dkt. 137-3 at 50:9-14, 52:2-13].   Plaintiff

immediately held his hand to his face.  [Dkt. 112-3 at 57:20-24; Dkt. 126-14 at 14;

Dkt. 126-3 at 52:10-18; Dkt. 127-7 (Pl.'s Dep.) at 57:20-24; Dkt. 137-3 at 52:10-18].

Afterwards, Defendant Belair stated to Plaintiff, "Now you want to cry? Now you

want to cry?" [Dkt. 112-3 at 57:1-6; Dkt. 126-3 at 52:10-21; Dkt. 127-7 at 57:1-6; Dkt.

137-3 at 52:10-21]. During this exchange, Plaintiff repeatedly apologized to

Defendant Belair.  [Dkt. 72-2; Dkt. 126-3 at 49:23-50:10; Dkt. 137-3 at 49:23-50:10].

Plaintiff testified that after Defendant Belair punched him the inside of his mouth

began bleeding and he swallowed the blood while he was speaking with the

Defendants and continued doing so until he was alone walking to his home which

was one mile away from the scene.  [Dkt. 112-3 at 57:20-24, 59:2-6; Dkt. 126-3 at

57:20-24, 59:2-6; Dkt. 126-14 at 13-14; Dkt. 127-7 at 107:7-108:25; Dkt. 137-3 at 57:20-

24, 59:2-6].  Plaintiff does not claim that he requested medical assistance or a ride

home from Defendants.  [Dkt. 112-3 at 60:18-61:19; Dkt. 126-3 at 128:2-8; Dkt. 127-

7 at 60:18-61:19; Dkt. 137-3 at 128:2-8]. On his one mile walk home, Plaintiff could no longer swallow the blood and it dripped out of his mouth onto his clothing. [Dkt. 112-3 at 59:2-5; Dkt. 126-3 at 59:2-6; Dkt. 127-7 at 59:2-6; Dkt. 137-3 at 59:2-6]. Plaintiff does not allege any Defendant saw that he was bleeding. He testified that he swallowed the blood until he was walking home after the Defendants had left the scene. *Id.*

Defendant Belair denies he punched Plaintiff. [Dkt. 112-4 (Belair Aff.) at ¶ 13]. Defendants Howley, Katkocin and Madore submitted affidavits swearing that they did not observe Defendant Belair punch Plaintiff and that they noticed no injury to Plaintiff's lip. [Dkt. 127-4 (Howley Aff.) at ¶¶ 11-13; Dkt. 127-5 at ¶¶ 11-13; Dkt. 127-6 at ¶¶ 10-13]. However, Plaintiff's brother, two co-workers, and an acquaintance testified that they observed Plaintiff's swollen lip in March 2013. [Dkt. 126-6 (J. Chalco Dep.) at 63:10-19; Dkt. 126-7 (Gallagher Dep.) at 98:12-14, 100:25-27; Dkt. 126-8 (Rizkallah Dep.) at 75:13-23, 78:9-27; Dkt. 126-9 (Guillcatanda Dep.) at 56:7-12]. Plaintiff also offers photographs of the inside of his mouth which he contends depict an injury to the inside of his mouth and a blood-stained jacket. [Dkt. 137-10 (Photographs of Plaintiff); Dkt. 137-5 (Photographs of Jacket)]. These are poor photographs and it is questionable whether they depict what Plaintiff offers them to show, but the Court assumes they depict what Plaintiff claims.

Following the incident, a complaint was made to the Danbury Police Department, and the resulting investigation determined that Defendants violated several department policies. Madore, Katkocin and Belair were found to have violated department policy by failing to activate, or disabling before the traffic stop

ended, video and audio recording systems in their vehicles. [Dkt. 126-14 at 10-11, 13-14]. Defendants Madore and Belair were found to have violated their duty of care by instructing Plaintiff to "walk home a distance of approximately one mile at approximately 0130 hrs during an intense snow storm" after Plaintiff had "already been seen stumbling in the roadway." *Id.* at 9-10, 13. The investigation also determined that Defendants Katkocin and Howley violated department policy by failing to intervene or report the incident to a supervisor when they observed Defendant Belair yelling at Plaintiff. *Id.* at 11-12. Defendants Katkocin and Howley also both reportedly told internal affairs that they saw, or knew that Plaintiff was allowed to, walk away from the scene. *Id.* at 11, 13. Plaintiff testified at his deposition that he walked home without incident and went to bed without seeking medical treatment. [Dkt. 112-3 at 61:6-64:7; Dkt. 127-7 at 61:6-64:7].

### III.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). This means that "although the court should review the record as a whole, it must disregard all evidence favorable

to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000); *see Welch-Rubin v. Sandals Corp.*, No. 3:03-cv-00481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) ("At the summary judgment stage of the proceeding, [the moving party is] required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient.") (citing *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011). Put another way, "[i]f there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH*, 446 F.3d 313, 315–16 (2d Cir. 2006) (internal citation and quotation omitted).

A party who opposes summary judgment "cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb*, 84 F.3d at 518. Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726–27 (2d Cir. 2010).

## IV.    Discussion

Section 1983 provides that "any person who, acting under color of law, 'subjects or causes to be subjected, any Citizen of the United States or other

person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and the laws' of the United States shall be liable to the injured party in actions at law." *Shattuck v. Stratford*, 233 F. Supp. 2d 301, 306 (D. Conn. 2002) (quoting 42 U.S.C. § 1983). Plaintiff has alleged that Defendants deprived him of his rights under the Fourteenth Amendment to the United States Constitution in violation of Section 1983 by (1) creating a risk of harm to him under a state-created danger theory and (2) acting with deliberate indifference to his medical need.

### A.    Qualified Immunity

Defendants argue that they are immune from liability under the doctrine of qualified immunity[1] under which "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800,

---

[1] Plaintiff argues that Defendants Madore, Howley and Katkocin have waived qualified immunity by failing to raise it in their original motion for summary judgment. Plaintiff cites *Blissett v. Coughlin* in which the court *sua sponte* raised the question of qualified immunity on the morning of trial. 66 F.3d 531, 538-39 (2d Cir. 1995). The court did not allow the affirmative defense because counsel could not articulate it differently from his defense that no constitutional violation occurred. *Id.* at 539. Unlike in *Blissett*, Defendants are specifically pursuing the defense, Plaintiff has known Defendants intended to assert it for over two months, and Plaintiff has had an opportunity to respond. Plaintiff is not prejudiced as the defense was not asserted on the eve of trial. Similarly, *McCardle v. Haddad* is inapposite because defendant moved after trial for judgment as a matter of law and briefly mentioned qualified immunity as one basis for relief. 131 F.3d 43, 52 (2d Cir. 1997). The defendant in *McCardle* did not raise qualified immunity at summary judgment or in any other pretrial motion. *Id.* The Court also finds that denying Plaintiff's waiver argument fulfills the purpose of the qualified immunity "to avoid subject[ing] government officials either to the costs of trial or the burdens of broad-reaching discovery in cases where the legal norms the officials are alleged to have violated were not clearly established at that time." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (internal citations and quotations omitted).

818 (1982); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009). When considering qualified immunity, "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established [and] [t]his inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix v. Luna*, 136 S.Ct. 305, 308, 193 L.Ed.2d 255, 308 (2015) (internal citations and quotations omitted). For a right to be clearly established, it must be "sufficiently clear that a reasonable official would understand what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Reichle v. Howards*, 566 U.S. 658, 664 (2012).

The factors to assess in determining whether a right was clearly established are: "(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful." *Pena v. DePrisco*, 432 F.3d 98, 115 (2d Cir. 2005) (internal citation omitted). This does not mean that there must be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

"Even where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995) (citing *Anderson*, 483 U.S. at 641). Since law enforcement

officers must make prompt decisions in rapidly evolving situations "there can frequently be a range of responses to given situations that competent officers may reasonably think are lawful." *Walczyk v. Rio*, 496 F.3d, 139, 154 n. 16 (2nd Cir. 2007). Qualified immunity is a "forgiving" standard. *Amore v. Novarro*, 624 F.3d 522, 530 (2d Cir. 2010). Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

"Qualified immunity is an affirmative defense and the burden is on the defendant-official to establish it on a motion for summary judgment." *Bailey v. Pataki,* 708 F.3d 391, 404 (2d Cir. 2013). In assessing the validity of a qualified immunity defense, the Court is "not concerned with the correctness of the defendants' conduct, but rather the 'objective reasonableness' of their chosen course of action given the circumstances confronting them at the scene." *Lennon*, 66 F.3d at 421. "For a defendant to secure summary judgment on the ground of qualified immunity, he must show that no reasonable jury, viewing the evidence in the light most favorable to the Plaintiff, could conclude that the defendant's actions were objectively unreasonable in light of clearly established law." *Ford v. Moore*, 237 F.3d 156, 162 (2d Cir. 2001). "[A] court may grant [summary] judgment if it is clear—after viewing the facts in the light most favorable to plaintiff—that reasonable law enforcement officers could have disagreed about whether defendants' conduct violated the law." *Ozga v. Elliot*, 150 F. Supp. 3d 178, 189 (D. Conn. 2015).

In this case, Defendant Madore conducted a traffic stop of Plaintiff's vehicle. The parties dispute whether Defendant Belair punched Plaintiff during the traffic stop. [Dkt. 112-4 at ¶ 13; Dkt. 126-3 at 52:2-13; Dkt. 137-3 at 52:2-13]. There is thus a genuine issue of material fact as to whether Plaintiff was struck by Defendant Belair. It is clearly established that a person has a right not to be struck without provocation or justification by a police officer. *Abujayyab v. City of New York*, No. 15 CIV. 10080 (NRB), 2018 WL 3978122, at *8 (S.D.N.Y. Aug. 20, 2018) ("[F]reedom from the use of excessive force has long been a clearly established constitutional right, and that right is violated when an individual is 'punched in the face without provocation' by a police officer."). Therefore, as the Court held in its order denying Defendants' Motions for Summary Judgment on June 1, 2017, there is a genuine issue of material fact as to whether Defendant Belair struck Plaintiff and Defendant Belair is not entitled to qualified immunity. [Dkt. 94 at 9-10].

Defendants had Plaintiff's vehicle towed from the scene because he did not have a valid driver's license. [Dkt. 112-3 at 54:19-24; Dkt. 126-3 at 54:19-24; Dkt. 127-6 at ¶ 8; Dkt. 137-3 at 54:19-24]. Defendants did not offer Plaintiff a ride home or summon medical care. [Dkt. 112-3 at 59:19-24, 61:6-19; Dkt. 127-7 at 59:19-24, 60:18-61:19; Dkt. 126-3 at 59:19-24; Dkt. 137-7 at 59:19-24]. The parties do not dispute that Defendant Belair left the scene as a tow truck operator was handing Plaintiff a business card. [Dkt. 112-4 at ¶ 16; Dkt. 126-3 at 54:15-24; Dkt. 137-7 at 54:15-24]. The parties also do not dispute that Plaintiff exhibited no injuries. [Dkt. 112-3 at 57:20-24, 59:2-6; Dkt. 127-7 at 107:4-108:25; Dkt. 137-3 at 57:20-24, 59:2-6]. Assuming Defendant Belair did strike Plaintiff, the relevant inquiry is whether

Plaintiff's right to a ride home and medical care after being assaulted by Defendant Belair was clearly established such that it is "beyond debate" that the Defendants acted unreasonably in light of existing precedent. *al-Kidd, supra*, 563 at 741.

Viewing the facts in the light most favorable to Plaintiff, the Court finds that reasonable law enforcement officers could have disagreed about whether Defendants' conduct violated the law. The Court has not found, and the parties have not identified, any existing Supreme Court or Second Circuit precedent that clearly establishes Plaintiff's constitutional rights to a ride home or medical attention.

During his deposition, Plaintiff admitted he was bleeding inside his mouth only, that he concealed his injury from the officers by swallowing the blood until he was walking home and the Defendant officers had left the scene, and that he did not ask for medical attention. [Dkt. 112-3 at 57:2-59:24; Dkt. 126-3 at 57:2-59:24; Dkt. 127-7 at 57:2-61:13, 107:4-108:25; Dkt. 137-3 at 57:2-59:24].[2] The only evidence that they may have perceived him to have been impaired is a statement in the internal affairs report to the effect that the Defendants observed Plaintiff stumbling. As noted above, there can frequently be a range of responses to a given situation that

---

[2] Plaintiff's Memorandum contradicts this admission by stating Plaintiff was bleeding profusely at the scene of the incident and citing to Plaintiff's deposition. [Dkt. 126 (Pl.'s Mem. of Law in Opp'n to Def. Belair's Renewed Summ. J. Mot.) at 2; Dkt. 137 (Pl.'s Mem. of Law in Opp'n to Defs. Madore, Howley and Katkocin's Renewed Summ. J. Mot.) at 2]. Plaintiff does not make that statement in his deposition. Instead, the following colloquy appears: "A. [S]o I was swallowing my blood. I raise my hand to my lips because I feel I was bleeding already. Q. Okay. So were you raising your hand to your lips because you were bleeding? A. Yes. . . . Q. Do you recall previously stating to the police officers and Lieutenant Lopes that you were bleeding a lot, and it was bleeding all down your face and onto your clothing? A. Yeah. When I started walking home, I couldn't – when I was walking home, I couldn't swallow more blood, and then I started bleeding on my pants and in my jacket that I had on. When I opened my jacket, I got some blood on my shirt, too." [Dkt. 112-3 at 57:20-59:6; Dkt. 126-3 at 57:20-59:6; Dkt. 127-7 at 57:20-59:6; Dkt. 137-7 at 57:20-59:6].

competent officers may reasonably think are lawful.  *See Walczyk v. Rio*, *supra*.  An objectively reasonable and competent officer could have perceived Plaintiff to be stumbling not because he was injured, but because he was walking over slippery snow.[3]  Indeed, it is more likely that a reasonably objective officer would perceive an evidently unimpaired pedestrian stumbling as they walked through a snow storm to be stumbling because the snow was slippery not because they were injured.  Plaintiff cites a variety of cases, but none of them clearly establish the right of an individual with no discernable injury to medical assistance or a ride after their vehicle is impounded.

The fact that an internal affairs investigation concluded that Defendants violated police department policy does not deprive Defendants of qualified immunity for several reasons.  First, a finding made in hindsight and upon contemplation is not the context of a qualified immunity analysis.  Second, the purpose of the internal affairs investigation was not to determine objectively whether the officers acted reasonably under the circumstances.  Finally, an internal police department policy is not a clearly established law.

With regard to state created danger, Plaintiff cites two out of circuit cases and argues that they were both "based on the existence of a special relationship between the state and the victim."  As an initial matter, this authority is not controlling; more crucially, it is not persuasive.  This argument misses a crucial point in Second Circuit case law.  In discussing *Wood v. Ostrander*, the Second Circuit stated, as does Plaintiff, that it "seems to rely on the existence of a special

---

[3] The conditions were slippery: "Q . Okay. So as you approached the stop sign, if I understand you, then you tried to stop the car, and it skidded? A. Yes." [Dkt. 126-3 at 30:3-24; Dkt. 137-3 at 30:3-24].

relationship between the state and the victim. Some courts have, indeed, incorporated the 'special relationship' criterion as a prerequisite to liability. We, by contrast, treat special relationships and state created dangers as separate and distinct theories of liability." *Pena*, 432 F.3d 109. Plaintiff did not make a claim for a violation of his Fourteenth Amendment rights on a theory of special relationship.

Even had he done so, Defendants would be entitled to qualified immunity because there was no special relationship and the cases cited by Plaintiff do not clearly establish Plaintiff's constitutional right to a ride home or medical care after he was punched by Defendant Belair. Plaintiff cited *Cooper v. City of Hartford,* with no argument as to why it is analogous to the facts of this case. No. CIV A 3:07-CV-823JCH, 2009 WL 2163127, at *4 (D. Conn. July 21, 2009). Indeed, it is not. In *Cooper*, the Court found that a patently and seriously injured individual was involuntarily in police custody and thus, he had a special relationship with the police. *Id.* at *14. There the police officers intercepted Good Samaritans who were transporting the victim of a fatal gunshot wound to the hospital. *Id.* at *2. The officers seized the victim, did not proceed to the hospital with haste and the victim expired before receiving treatment. *Id.* at *2-3. Because of that special relationship, the police had an affirmative duty to protect him. *Id.* In contrast to the case at bar, the victim in *Cooper* was unquestionably injured, unable to ambulate, was in police custody and was prevented from receiving treatment. Here Plaintiff was never in custody. His person was not seized, his vehicle was impounded. Furthermore, Plaintiff concealed his injury and was able to walk well enough to travel on foot one mile to his home. Obviously, the officers did not know for certain that he would

arrive home safely, but the fact that he did is evidence that an objective officer might reasonably perceive him to be able to do so. Thus, no special relationship can be said to have been created even if Defendant Belair did strike Plaintiff.

With regard to deliberate indifference to medical need, Plaintiff appears to argue that the right to care is clearly established because the Supreme Court held in *City of Revere v. Mass. Gen. Hosp.* that the due process clause "require[s] the responsible government or governmental agency to provide medical care to persons . . . who have been injured while being apprehended by police." 463 U.S. 239, 244 (1983). In that case, police responded to a report of an active breaking and entering, wounded the suspect, and called for an ambulance. *Id.* at 240. The suspect received care and the case involved a dispute between the hospital and the city over who should pay the costs. *Id.* at 241. This case is inapplicable because, unlike the present circumstances, it involved a pretrial detainee. *Id.* at 244-45.[4] Plaintiff cites additional cases describing deliberate indifference to medical needs for pretrial detainees and prisoners, but none of these cases finds that individuals like Plaintiff, who was not a pretrial detainee, have a clearly established constitutional right to medical treatment after being struck by a police officer.

---

[4] The same analysis applies to Plaintiff's citation of *Garcia v. Dutchess County* because the individual in question was arrested. 43 F. Supp. 3d 281, 287-88. The court found that it was "clearly established in 2010 that once [the officer] knew [the arrestee] was not breathing, [the officer] had a constitutional obligation to ensure . . . [he] received adequate medical care." *Id.* at 300. As the undisputed record reflects, Plaintiff had no visible injuries. Moreover, unlike an arrestee who had no ability to ability to care for himself while in custody, Plaintiff was free to leave and seek care. Instead, Plaintiff went home and went to sleep. [Dkt. 112-3 at 61:24-62:14; Dkt. 127-7 at 61:24-62:14].

For these reasons, the Court cannot find that Defendants actions, although inimical to the police department's purpose to assure public safety and likely to undermine public trust in law enforcement, were objectively unreasonable in light of existing precedent.  Therefore, Defendants' Motions for Summary Judgment are GRANTED on the grounds that Defendants are entitled to qualified immunity.

### B.    §1983 Claims for Violation of Fourteenth Amendment Rights

As explained above, all of the Defendants are entitled to qualified immunity. However, assuming *arguendo* that Defendants were not entitled to qualified immunity, the Court finds that there is no genuine dispute of material fact and Defendants are entitled to judgment as a matter of law on Plaintiff's claim that they deprived him of his Fourteenth Amendment rights in violation of Section 1983 by (1) creating a risk of harm to him under a state-created danger theory and (2) acting with deliberate indifference to his medical need.

### 1.    State Created Danger

A Section 1983 claim for violation of an individual's Fourteenth Amendment rights under a theory of state created danger may exist when "the state affirmatively creates a danger that results in the likelihood of physical harm or death." *Hirsch v. New York*, No. 18-0405, 2018 WL 4846523, at *2 (2d Cir. Oct. 4, 2018) (citing *Okin v. Vill. Of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 419 (2d Cir. 2009). A plaintiff must also demonstrate that the government action was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cty. Of Sacramento v. Lewis*, 523 U.S. 833, 847 n. 8.  In these exceptional circumstances, the state may have a constitutional obligation to

provide protection. *See Ying Jing Gan v. City of New York*, 996 F.2d 522, 533 (2d Cir. 1993) (citing *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 198 (1989)). However, this duty only arises when the state takes an affirmative action. "A failure to interfere when misconduct takes place, and no more, is not sufficient to amount to a state created danger." *Pena*, 432 F.3d at 110.

The Second Circuit defines state created danger liability as "aris[ing] from the relationship between the state and the private assailant." *Id*. at 109. For example, the Second Circuit has found that liability may exist under a state created danger theory where plaintiff alleged that police told "skinheads" attending a rally that the police would not interfere with or arrest the skinheads for assaulting any flag-burners and where police returned a firearm to a robbery victim and agreed to bring the victim to the scene of the robber's arrest where he shot the robber. *Dwares v. City of New York*, 985 F.2d 94, 99 (2d Cir. 1993) (overruled on other grounds by *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163 (1993)) and *Hemphill v. Schott*, 141 F.3d 412, 418-20 (2d Cir. 1999); *see also Snider v. Dylag*, 188 F.3d 51, 55 (2d Cir. 1999) (reversing dismissal of a § 1983 action where prison guard allegedly told inmates it was "open season" on another inmate who was subsequently assaulted); *see also Pena*, 432 F.3d 98, 111 (holding that defendant officers engaged in affirmative conduct constituting state action when they implicitly sanctioned drinking while on duty).

Here, Plaintiff's Section 1983 claim under a state created danger theory fails as a matter of law because the undisputed facts demonstrate that there was no affirmative conduct by Defendants that created a dangerous situation which

harmed Plaintiff.  There was no affirmative act by which Defendants sanctioned the conduct of a private assailant.  *Okin*, 577 F.3d 415, 429 (2d Cir. 2009) ("The affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence.").  Defendants failed to offer Plaintiff a ride home after he was assaulted by Defendant Belair and his car was towed.  He walked approximately one mile home in winter weather conditions.  [Dkt. 126-14 at 9-10, 13].  Defendants' actions were against their department protocol, however their failure to act does not constitute a state created danger.  Unlike the examples cited above, in this action Defendants did not create a danger to Plaintiff by sanctioning or facilitating harm to him from a private actor.

Plaintiff cites *Pena v. DePrisco* in an attempt to argue that Defendant Belair took affirmative action against Plaintiff by punching him and Defendants Madore, Katkocin and Howley are liable, even without affirmative action, for failure to offer Plaintiff a ride home.  In *Pena*, the court held that liability can arise where state officials communicate, even implicitly, prior assurances to private individuals that they will not be punished or interfered with when engaging in misconduct that is likely to endanger others.  432 F.3d at 111.  *Pena* is distinguishable for the reasons set forth above.  There was no harm to Plaintiff from a private actor.  Second, Defendants Madore, Katkocin and Howley's conduct was a failure to act—not an implicit sanction of private misconduct.  As *Pena* expressly stated, "failure to interfere when misconduct takes place, and no more, is not sufficient to amount to a state created danger."  *Id.* at 110.

Even if Defendants' conduct could constitute affirmative state action, the Court does not find that it shocks the conscience. "Government action resulting in bodily harm is not a substantive due process violation unless 'the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Pena*, 432 F.3d at 112; *see also Lombardi v. Whitman*, 485 F.3d 73, 81 ("In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances.") (internal citation omitted). The facts of this case are not egregious. The Supreme Court has recognized that deliberate indifference can also support a substantive due process claim where the situation allowed time for reflection as opposed to an emergency situation: "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850.

Under these circumstances, Defendants' conduct does not rise to the level of shocking to the conscience or deliberate indifference. It is undisputed that Plaintiff was not severely injured. Indeed, Plaintiff himself stated that he did not seek medical care after the incident because he thought it was "not a big injury." [Dkt. 112-3 at 63:19-20; Dkt. 127-7 at 63:19-20]. Although Plaintiff should not have had to endure Defendants' treatment of him that evening, their behavior does not rise to the level of shocking the conscience. After Defendant Belair struck Plaintiff, Defendants allowed Plaintiff to walk home. However, Plaintiff exhibited no signs

of injury. [Dkt. 112-3 at 57:20-24, 59:2-6; Dkt. 127-7 at 57:20-24, 59:2-6, 107:4-108:25]. Plaintiff was not bleeding on the outside of his face. [Dkt. 127-7 at 58:8-22, 107:4-108:25]. Plaintiff did not request medical treatment. *Id.* at 60:18-61:1. Plaintiff did not request a ride home. [Dkt. 126-3 at 128:2-8; Dkt. 127-7 at 61:6-19; Dkt. 137-3 at 128:2-8]. There is no claim that Plaintiff was dizzy, disoriented or suffering from a concussion after the punch. Because the Plaintiff did not exhibit any signs of injury, lived only one mile away from the scene of the incident and was able to walk steadily enough to get home safely, the Court finds that Defendants' failure to give Plaintiff a ride home or summon medical assistance does not shock the conscience or exhibit deliberate indifference.

For these reasons, Defendants' Motions for Summary Judgment as to Plaintiff's Section 1983 claim for violation of his Fourteenth Amendment rights on a theory of state created danger are GRANTED.

### 2. Deliberate Indifference to Medical Needs

Defendants argue that they did not act with deliberate indifference to Plaintiff's medical needs. Both parties cite cases setting forth the standard for deliberate indifference to medical needs for pretrial detainees. But, as Defendants correctly state and this Court previously found, Plaintiff was not a pretrial detainee. Therefore, the cases the parties cite are inapplicable. Plaintiff's claim, however, should be analyzed according to relevant substantive due process case law.

For the same reasons set forth above with regard to Plaintiff's state created danger theory, Plaintiff's claim for deliberate indifference to medical needs must also fail. The undisputed facts show that there was no affirmative government

action by Defendants which assisted in creating or increasing a danger to Plaintiff from a private actor. *Kaya v. City of New London*, No. CIV.A. 3:05-CV-1436J, 2008 WL 220745, at *9 (D. Conn. Jan. 25, 2008) ("The problem with the plaintiff's argument is that the requirement of conscience-shocking behavior is a requirement that must be met *in addition to* the requirement of affirmative government action. . . . Having failed to meet the latter requirement, it is irrelevant whether or not the plaintiffs can meet the former.").

Moreover, as described above, Plaintiff did not exhibit signs of an injury after he was assaulted by Defendant Belair, thus Defendants' failure to offer Plaintiff a ride home or summon medical assistance is not shocking to the conscience or deliberately indifferent to his medical needs. Therefore, Defendants' Motions for Summary Judgment as to Plaintiff's Section 1983 claim for violation of his Fourteenth Amendment rights on a theory of deliberate indifference to medical needs are GRANTED.

## V.    Conclusion

For the foregoing reasons, the Court GRANTS Defendants' Motions for Summary Judgment. [Dkts. 112, 127].

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: November 9, 2018